**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **A.F.-1, J.F., and A.F.-2**

**No. 21-0711** (Monongalia County 20-JA-227, 20-JA-228, and 20-JA-229)

**MEMORANDUM DECISION**

Petitioner Father D.F., by counsel A. Tyler Reester, appeals the Circuit Court of Monongalia County's August 6, 2021, order terminating his parental rights to A.F.-1, J.F., and A.F.-2.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem for A.F.-1, Teresa Lyons, filed a response on behalf of that child in support of the circuit court's order. The guardian ad litem for J.F. and A.F.-2, Amanda Ray, filed a response on behalf of those children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in (1) accepting deficient case plans; (2) finding that the DHHR was making reasonable efforts to achieve permanency for the children; (3) finding that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected; (4) improperly relying on hearsay evidence; (5) denying petitioner a post-adjudicatory improvement period; (6) issuing a deficient dispositional order; and (7) finding that it had jurisdiction to preside over these proceedings.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Prior to the proceedings giving rise to the current appeal, petitioner and the children's mother had an extensive history of Child Protective Services ("CPS") involvement after their adoption of the children several years ago. According to the evidence presented in the current

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because two of the children share the same initials, we refer to them as A.F.-1 and A.F.-2, respectively, throughout the memorandum decision.

matter, the parents had two prior CPS cases: one in 2013 and another in 2018. A third CPS case was opened and eventually gave rise to the current proceedings. According to the record, the prior referrals—though not followed by petitions—involved similar allegations to the instant proceedings. Additionally, the record reflects that the court referred to the instant proceedings as being the third CPS proceedings involving the parents. Relevant to the issues on appeal is the undisputed fact that petitioner received services over a period of several years prior to the filing of the instant petition.

In December of 2020, the DHHR filed an abuse and neglect petition against petitioner and the mother alleging that they failed to provide the children a safe and secure home environment, refused to supply them with necessary food and shelter, and emotionally abused them by employing harsh and neglectful disciplinary tactics. The DHHR alleged that the parents punished the children by periodically making them sleep outside alone in a tent while the rest of the family remained inside with door locked, and withheld food as a form of discipline. The DHHR further alleged that when the children removed food items from the kitchen without specific permission to do so, the parents would consider it a form of "stealing" and punished the children. The parents did not deny occasionally putting the children in the tent or withholding food as forms of punishment and claimed the tactics stemmed from a disciplinary program based in Florida. According to the petition, then thirteen-year-old A.F.-1 received more punishment than the younger children. At the time of the petition, a CPS worker traveled to Georgia to take A.F.-1 into custody, where he was attending the Alice Blount Academy of Science and Agriculture, a residential school for boys with emotional and behavioral challenges.

Later that month, following further investigation, the DHHR filed an amended petition, adding more specificity to the allegations. The DHHR alleged the parents forced the children to sit on the rim of an open five-gallon bucket for hours at a time, removed A.F.-1's bedroom door as a form of punishment, employed security cameras throughout the home to document the children committing infractions, mandated the children perform strenuous labor as punishment, restricted A.F.-1's food intake if his weight exceeded 100 pounds, and barred the children from attending school when they were subject to punishment. According to the amended petition, A.F.-1 disclosed in a Child Advocacy Center ("CAC") interview that he was subjected to the tent punishment beginning when he was ten years old. The child noted that he was sometimes required to reside in the tent without any footwear, and always without any comfort items, including a flashlight. The child noted that he was punished during his birthday week—in November of 2020—after he was caught looking inside of a kitchen cabinet for food. The child claimed he did not remove any food from the cabinet but was nevertheless forced to spend a night inside the tent. The child disclosed that he was upset about his tent punishment and broke his soup bowl, which earned him another night in the tent. The child also threw a crayon marker and hit the mother the following day and ended up spending five consecutive nights in the tent, during which time the family ate his birthday cake without him. The DHHR alleged that many of A.F.-1's disclosures were corroborated by J.F. The DHHR did not interview then nine-year-old A.F.-2, who is legally blind and deaf.

The circuit court appointed a Court-Appointed Special Advocate ("CASA") in January of 2021. The CASA worker filed three reports throughout the proceedings, including recommending an improvement period for both parents in a report prepared for the dispositional hearing.

In March of 2021, law enforcement officials executed a criminal search warrant against the parents. The items listed in the warrant were substantially similar to or identical to items requested by the DHHR in a motion to compel discovery, which the circuit court had earlier rejected. Following the execution of the criminal search warrant, the parents stated they were advised by their counsel to refrain from communicating with parties to the case without counsel present in accordance with their Fifth Amendment right against self-incrimination.

Later that month, the circuit court held an adjudicatory hearing during which the parents stipulated that they "engaged in excessive corporal punishment and failed to provide necessary food and shelter, resulting in emotional abuse." The parents then filed motions for post-adjudicatory improvement periods. The DHHR opposed the parents' motions based upon the severity of the abuse and neglect. The next month, the DHHR filed a motion requesting that the circuit court find aggravated circumstances. One day later, the guardian filed a motion to continue, which the court granted. In May of 2021, the guardian filed a report recommending post-adjudicatory improvement periods for both parents.

The circuit court held a series of hearings from May of 2021 until August of 2021 during which it heard evidence regarding the parents' motions for improvement periods as well as the DHHR's motion to terminate the parents' parental rights. The first hearing in May of 2021 was continued due to the DHHR's failure to timely file family case plans. Later that month, the guardian filed a motion for an additional guardian noting that "a conflict may arise when permanency for the children is addressed." The court granted the motion and appointed a second guardian to represent J.F. and A.F.-2. In June of 2021, the first guardian filed a supplemental report, and the newly appointed guardian filed a preliminary report on the same day. Neither guardian was opposed to an improvement period for the parents.

At a hearing in June of 2021, the DHHR objected to granting the parents' motions for improvement periods and claimed that no services were available to them. The DHHR also renewed its motion that the circuit court find aggravated circumstances in the proceedings. During the hearings, Barbara Nelson, a psychologist who performed psychological evaluations with A.F.-1 and J.F., testified that although the children were traumatized in their birth home (which led to the termination of the biological parents' parental rights), they were more recently traumatized in the home of petitioner, their adoptive parent. Ms. Nelson testified that the abuse and neglect that the children disclosed they suffered in the adoptive parents' home amounted to torture. She further testified that the parents implemented harsher disciplinary tactics than the regimen that the parents claimed they followed at the advice of professionals. Ms. Nelson noted that the program the parents claimed to follow recommended taking away privileges and recreational items as a form of punishment. However, Ms. Nelson stated that the parents took away life necessities, such as food and shelter, which was particularly troubling given the history of abuse and neglect that the children suffered prior to coming to their adoptive parents' home. As such, Ms. Nelson testified that the parents exacerbated the emotional and behavioral issues that the children developed from the abuse and neglect they suffered in the care of their biological parents.

Ms. Nelson further testified that although then thirteen-year-old J.F. was not subjected to the parents' discipline tactics as often as A.F.-1, she was still traumatized by the environment

created in the home. Ms. Nelson stated that J.F. formed an unhealthy alliance with her parents, placing J.F. in the status of the preferred child and causing her to take on the role of an informant against her brother, A.F.-1. This fact was evidenced by J.F.'s repeated use of the term "we," to convey that she and her parents had to administer discipline to A.F.-1 because he was a bad person. Ms. Nelson opined that J.F. displayed narcissistic qualities and other indicators of a developing personality disorder, which could affect the child's future ability to form relationships as well as her ability to restore her relationship with her brother, A.F.-1. Moreover, Ms. Nelson found that J.F.'s prognosis for improvement was "very poor," and indicated that she would need intensive therapy to "re-program" the way of thinking she had developed due to the abusive and neglectful discipline tactics that her adoptive parents employed in the home. Further, a therapist for A.F.-1 and a therapist for J.F. opined that the children had suffered trauma in the adoptive parents' home and the children would require intensive therapy to recover. Each of the children's therapists also testified that the children would need individual therapy for an indiscernible period of time before they could proceed to any type of family therapy.

The parents retained a psychological expert, Dr. Ronald Federici, to conduct parental fitness evaluations and presented his testimony in support of their motions for improvement periods. Dr. Federici opined that the parents were intelligent and capable of changing their parenting methods. He further testified that both parents acknowledged in retrospect that the discipline program they had implemented with the children was harsh but further explained that they had relied on professionals who recommended the program.

Next, the parents testified and displayed some acceptance of responsibility. However, they also minimized the severity of the disciplinary tactics that they employed and blamed the program they utilized and the professionals who recommended it. The parents explained that the program was the Parent Help Center, a behavioral modification program for children and their parents, located in Jacksonville, Florida. They stated that the program was founded on the principles of the Parent Project, a parent-training program for children with behavioral challenges. The parents claimed they participated in extensive and continuing training and were in regular contact with the Parent Help Center throughout the time they participated in the program. The parents testified that after the DHHR filed the instant petition, they began searching for therapies and services to aid in the reunification process. For instance, the parents stated they contacted Dr. Federici in February of 2021, and later participated in training seminars and began meeting with a local therapist for trauma therapy related to the instant case. Moreover, the parents continued to blame A.F.-1 for many of the issues inside the home and minimized his disclosures of the abuse and neglect he suffered.

At the conclusion of the dispositional hearings, the DHHR and guardians asked the court to terminate the parents' parental rights. After considering the evidence, the court found that there were no aggravated circumstances of abuse and neglect. However, the court found that there was no reasonable likelihood that the parents could substantially correct the conditions of abuse and neglect in the near future given their failure to fully acknowledge the abuse and neglect they perpetrated upon the children. The court found that "the amount of time required for the children to be integrated into a stable and permanent home environment [with petitioner] . . . is lengthy at best which is not in line with the best interests of the children." Further, the court considered the expressed wishes of the older children, A.F.-1 and J.F. (A.F.-1 did not wish to return to the parents'

home while J.F. expressed a desire to do so) and found that their best interests were served by termination of the parents' parental rights. As such, the court terminated petitioner's parental rights by its August 6, 2021, order.[2] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first argues that the DHHR's "case-specific facts contained in the case plans" are not supported by the record and that the case plans are deficient under West Virginia Code § 49-4-604(a). In support of his assignment of error, petitioner contends that the DHHR filed nearly identical case plans for each of the children in May of 2021. Further, petitioner takes issues with several factual findings listed in the case plans, including attacking the forensic psychological evaluations, and statements by the DHHR that petitioner failed to provide sufficient admission of abuse and neglect against the children. We find petitioner's arguments without merit.

As this Court has explained,

"[t]he purpose of the family case plan as set out in W.Va. Code [§ 49-4-408(a)] . . . is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." Syl. Pt. 5, *State ex rel. Dep't of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987).

Syl. Pt. 2, *In re Desarae M.*, 214 W. Va. 657, 591 S.E.2d 215 (2003).

It is important to note that petitioner does not challenge the timeliness or manner in which the DHHR filed case plans for the children during the proceedings below. The record reflects that these case plans satisfied all legal requirements, demonstrated reasonable efforts by the DHHR, and were properly adopted by the circuit court. Additionally, there is no record of any objection

---

[2]The mother's parental rights were also terminated below. The permanency plan for the children is adoption in their current foster homes.

by petitioner or his counsel to the case plans that he now claims were inadequate. "'Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 349 n.20, 524 S.E.2d 688, 704 n.20 (1999)." *Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 821, 679 S.E.2d 650, 653 (2009). Therefore, this argument will not be considered on appeal.

Next, petitioner alleges that the circuit court erred in finding that the DHHR made reasonable efforts to reunify the family. According to petitioner, the DHHR offered no services to facilitate reunification despite his repeated requests for services. Petitioner contends that the majority of services offered by the DHHR, including the children's forensic evaluation, visitation, and children's therapy, were all employed by the DHHR, at disposition, to argue for the termination of his parental rights. Petitioner argues that the DHHR removed the children from his home and then proceeded to create a case against petitioner based upon the services that it chose to provide. Finally, petitioner notes that the circuit court did not make a finding of aggravated circumstances, and the DHHR was required to provide reasonable efforts to preserve the family. We find, however, that this argument cannot entitle petitioner to relief.

According to West Virginia Code § 49-4-604(c)(7)(A),

[f]or purposes of the court's consideration of the disposition custody of a child pursuant to this subsection, the department is not required to make reasonable efforts to preserve the family if the court determines: . . . The parent has subjected the child, another child of the parent or any other child residing in the same household or under the temporary or permanent custody of the parent to aggravated circumstances which include, but are not limited to, abandonment, torture, chronic abuse, and sexual abuse.

Petitioner is correct that the circuit court did not make a finding of aggravated circumstances, relieving the DHHR of its requirement to provide reasonable efforts to preserve the family. However, petitioner does not dispute that he and the children received services throughout the proceedings. Indeed, A.F.-1 was provided therapy by the DHHR. Yet, despite several months in therapy, A.F.-1 had shown no willingness to return to petitioner's home and, in fact, explicitly refused to do so. Further, the DHHR provided supervised visits with the two younger children and the parents, which was a direct service. Although petitioner claims that he requested further services be provided to him during the proceedings below, he fails to cite to the record evidencing his requests. Petitioner was free to request any other service that he felt would benefit the achievement of permanency in this case but made no such request. Petitioner continues to try to mitigate and justify his actions, in defiance of his stipulation to "excessive corporal punishment . . . which resulted in physical abuse." Petitioner's suggested resolution to excessive corporal punishment resulting in physical abuse is a simple decision to stop doing these things. Consequently, despite petitioner's argument that the DHHR failed to provide him services, it appears as though he does not believe he needs any services.

Additionally, prior to the filing of the initial petition in this case, petitioner had completed foster parent training and had been provided further direction by the DHHR regarding inappropriate forms of discipline following additional abuse and neglect referrals made against

him in 2013 and 2018. Nevertheless, petitioner continued to use disciplinary practices which were abusive and neglectful, and those practices eventually culminated in the filing of a petition alleging abuse and neglect. Thus, there was no evidence that petitioner would benefit from repeating the same type of services which had already proven to be unsuccessful. At no time did petitioner make a specific request that the DHHR provide him any particular service, aside from suggesting that family therapy should proceed in contravention of the recommendations of the children's therapists. In addition, there was no evidence that petitioner was unable to obtain or to bear the expense of any services. In fact, petitioner secured an evaluation of himself with a prominent expert and by his testimony obtained therapy for his own benefit but chose not to present the testimony of that provider. Consequently, there is no evidence that the DHHR failed to provide reasonable services.

Next, petitioner argues that the circuit court erred in finding that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected in the near future. Petitioner contends that he demonstrated an "absolute willingness to engage in all remedial services and to participate in the reunification process." Petitioner also notes that the CASA and guardians recommended that petitioner receive an improvement period during the proceedings and argues that pursuant to *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980), he was entitled to an improvement period.

According to West Virginia Code § 49-4-604(d)(3), a situation in which there is "[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected" includes one in which the parent has

> not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare or life of the child.

Further, this Court has held that "a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period." *In re Emily*, 208 W. Va. 325, 336, 540 S.E.2d 542, 553 (2000). West Virginia Code § 49-4-610(2)(B) provides that the circuit court may grant a parent an improvement period when the parent "demonstrates, by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period." "This Court has explained that 'an improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the . . . parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged.'" *In re Kaitlyn P.*, 225 W. Va. 123, 126, 690 S.E.2d 131, 134 (2010) (citation omitted). However, the circuit court has discretion to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). We have previously held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator

of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted).

Contrary to petitioner's argument, we see no error in the circuit court's determination that petitioner was not likely to fully participate in an improvement period. The case to which petitioner cites, *In re R.J.M.*, deals with an outdated version of the statute governing improvement periods. This Court has more recently held that "[b]oth statutory and case law emphasize that a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period. Where an improvement period would jeopardize the best interests of the child, for instance, an improvement period will not be granted." *In re Charity H.*, 215 W. Va. 208, 216, 599 S.E.2d 631, 639 (2004). Here, the circuit court found that petitioner failed to make significant progress during the eight-month course of the proceedings, including the fact that he minimized responsibility for abusing and neglecting the children. Although earlier reports of the guardians ad litem were supportive of an improvement period for petitioner, at the time of the final dispositional hearing, neither guardian argued that petitioner should be granted an improvement period. Both guardians cited the lack of full acknowledgement of abuse and neglect and their belief that the conditions of abuse and neglect could not be substantially corrected in the near future as reasons for denying petitioner's motion for an improvement period. Moreover, the court found that for eight years, petitioner had the opportunity to help the children overcome their past abuse and not only failed to do so but added to the children's trauma by subjecting them to additional abuse and neglect, and that, given petitioner's intellectual capacity, he should have known that the discipline he was administering was abusive. Based upon those findings, the court correctly denied petitioner an improvement period and soundly concluded that there was no reasonable likelihood that he could correct the conditions of abuse and neglect.

Next, petitioner argues that the circuit court erred in improperly relying on hearsay evidence in violation of West Virginia Code § 49-4-601(k), Rule 802 of the West Virginia Rules of Evidence, and Rule 8 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings. Specifically, petitioner contends that the court erred in relying on statements from the children during their CAC interviews, the testimony of the caseworkers concerning the children's statements to them, and the testimony of the children's evaluating psychologist and therapists in rendering its dispositional decision. We, however, find no error.

We have previously held that

"[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. Pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W.Va. 435, 452 S.E.2d 893 (1994).

Syl. Pt. 1, *State v. Payne*, 225 W. Va. 602, 694 S.E.2d 935 (2010). Moreover, "'[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.' Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469

(1998)." *Id.* at 604, 694 S.E.2d at 937, Syl. Pt. 2. It is well settled that "'[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, W.Va., 301 S.E.2d 596, 599 (1983)." Syl. Pt. 2, *State v. Peyatt*, 173 W. Va. 317, 315 S.E.2d 574 (1983).

First, petitioner asserts that the circuit court erred in admitting a letter written by one of the children to the circuit court, which was authenticated by the DHHR caseworker. Petitioner avers that this document was hearsay, as the child was not made available for cross-examination nor did a CAC employee ever testify. We reject petitioner's request as he fails to cite to the record demonstrating that he objected to the admission of the child's letter with a hearsay objection.

Indeed, a review of the record indicates that petitioner failed to raise any objection to the letter on the basis of hearsay.[3] We have repeatedly reminded litigants that, "[t]o preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect." *State v. Sites*, 241 W. Va. 430, 438, 825 S.E.2d 758, 766 (2019) (citation omitted). Moreover, "'[o]ne of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result' in the imposition of a procedural bar to an appeal of that issue." *State v. Miller*, 194 W. Va. 3, 17, 459 S.E.2d 114, 128 (1995) (citation omitted). Accordingly, because petitioner failed to object to the letter based on hearsay, we decline to address his argument on appeal. *See State v. Simons*, 201 W. Va. 235, 239, 496 S.E.2d 185, 189 (1997) (citation omitted) ("This Court has firmly established that '[w]here objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal.'").

Second, petitioner argues that the children's out-of-court statements to the psychologist and therapists are hearsay and "do not fall under the residual exception to the hearsay rule." Petitioner contends that the children's statements, especially those of A.F.-1, are not trustworthy. Petitioner avers that A.F.-1 and J.F. have been diagnosed with oppositional defiance disorder, suggestive of untrustworthiness, and that A.F.-1 has been diagnosed with reactive attachment disorder. Petitioner contends that A.F.-1's claims that petitioner attempted to keep him under 100 pounds and made him perform strenuous labor to stay underweight were refuted by his testimony and medical records in the proceedings below. Petitioner further contends that testimony of the children and their CAC interviews would be "more probative than the testimony of the [DHHR] workers and the forensic evaluator." We do not agree.

Regarding child abuse and neglect proceedings and children's testimony, we have held that

> [u]nder Rule 8(a) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, there is a rebuttable presumption that the potential psychological harm to the child outweighs the necessity of the child's testimony. The circuit court shall exclude this testimony if it finds the potential psychological harm to the child outweighs the necessity of the child's testimony.

---

[3]Petitioner objected to the admission of the letter below on the basis of relevancy and authenticity. However, petitioner does not argue these objections on appeal.

9

Syl. Pt. 7, in part, *In re J.S.*, 233 W. Va. 394, 758 S.E.2d 747 (2014).

In reviewing the court's admission of the forensic evaluator's and therapists' testimony, we begin with the well-established rule that

> [g]enerally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules.

Syl. Pt. 1, *State v. Maynard*, 183 W. Va. 1, 393 S.E.2d 221 (1990). Clearly, the children's statements to the forensic psychologist and therapists in the instant matter were hearsay as they were offered to prove the truth of the matter asserted. *See* W.Va. R. Evid. 801(c). However, despite the circuit court's failure to make such specific findings, we find that the psychologist's and therapists' statements from the children were properly admitted as falling under the residual exceptions to the hearsay rules embodied in West Virginia Rules of Evidence Rule 807.[4] This Court has held that

> [t]he language of Rule 804(b)(5) of the West Virginia Rules of Evidence and its counterpart in Rule 803(24) [now 807] requires that five general factors must be met in order for hearsay evidence to be admissible under the rules. First and most important is the trustworthiness of the statement, which must be equivalent to the trustworthiness underlying the specific exceptions to the hearsay rule. Second, the statement must be offered to prove a material fact. Third, the statement must be

---

[4]The residual exceptions to the hearsay rules permit the admission of hearsay statements that do not fall within one of the traditional exceptions. Rule 807 provides as follows:

(a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

(b) Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

shown to be more probative on the issue for which it is offered than any other evidence the proponent can reasonably procure. Fourth, admission of the statement must comport with the general purpose of the rules of evidence and the interest of justice. Fifth, adequate notice of the statement must be afforded the other party to provide that party a fair opportunity to meet the evidence. Syl. Pt. 5, *State v. Smith*, 178 W.Va. 104, 358 S.E.2d 188 (1987).

*In re J.S.*, 233 W. Va. at 407, 758 S.E.2d at 760.

In looking at the first of the five factors set forth in *In re J.S.*, we find that the children's statements were trustworthy. Although petitioner claims that A.F.-1 is untrustworthy because he allegedly has oppositional defiance disorder or reactive attachment disorder, we nonetheless find that his statements were sufficiently reliable. The DHHR provided the testimony of the psychologist and therapists who gave first-hand accounts of the children's consistent disclosures of abuse at the hands of petitioner, detailing the complex punishment system, use of the outdoor tent, and withholding of food. We further note that petitioner did not object to the child forensic interviewer's or therapists' qualifications as experts, nor did he raise any alleged impropriety in their questioning techniques and methods to attack the child's reliability or trustworthiness. Second, this evidence is clearly probative on the material issue of whether the children were abused and/or neglected by petitioner. Third, the interest of justice would be served by the admission of these statements considering that there was a presumption of psychological harm to the children that petitioner failed to rebut or otherwise challenge. Finally, the DHHR provided notice that it intended to offer this evidence, and petitioner was provided with a fair opportunity to prepare a defense to the evidence. Based on the foregoing, we find no error in the circuit court's decision to admit and consider the psychologist's and therapists' testimony about statements made by the children.

Next, petitioner argues that the circuit court's dispositional order is deficient per the requirements of West Virginia Code § 49-4-604(c)(6)(C)(iv) by failing to state "[w]hether or not the [DHHR] made reasonable efforts to preserve and reunify the family, or some portion thereof, including a description of what efforts were made or that those efforts were unreasonable due to specific circumstances." While the circuit court's August 3, 2021, order did not contain a verbatim finding that the DHHR made reasonable efforts pursuant to the statute, the court did make such findings following the first two dispositional hearings, and the orders containing those findings were incorporated into that order by the circuit court. Therefore, the requisite statutory finding was made, and there is no error in this regard.

Finally, petitioner argues that the Monongalia County Circuit Court did not have jurisdiction to preside over these proceedings pursuant to West Virginia Code § 49-4-606(b) and claims that the case belonged in the circuit court of origin. West Virginia Code § 49-4-606(b) states:

> If the child is removed or relinquished from an adoptive home or other permanent placement after the case has been dismissed, any party with notice thereof and the receiving agency shall promptly report the matter to the circuit court of origin, the department and the child's counsel, and the court shall schedule a permanency

11

hearing within sixty days of the report to the circuit court, with notice given to any appropriate parties and persons entitled to notice and the right to be heard. The department shall convene a multidisciplinary treatment team meeting within thirty days of the receipt of notice of permanent placement disruption.

Here, jurisdiction and venue of the proceedings was properly before the circuit court in Monongalia County. Contrary to petitioner's argument that West Virginia Code § 49-4-606(b) required that this abuse and neglect proceeding be heard by the circuit court that terminated the biological parents' parental rights, "[s]tatutes in *pari materia* must be construed together and the legislative intention, as gathered from the whole of enactments, must be given effect." Syl. Pt. 3, *State ex rel. Graney v. Sims*, 144 W. Va. 72, 105 S.E.2d 886 (1958); Syl. Pt. 2, *Murrell B. v. Clarence R.*, 242 W. Va. 358, 836 S.E.2d 9 (2019). Pursuant to West Virginia Code § 49-4-601(a), a petition alleging abuse and neglect may be filed "in the county in which the child resides, or if the petition is being brought by the [DHHR], in the county in which the custodial respondent or other named party abuser resides, or in which the abuse or neglect occurred." This subsection continues with "[u]nder no circumstance may a party file a petition in more than one county based on the same facts." In the case at issue, the abuse and neglect alleged in the petition occurred in Monongalia County. The children and adoptive parents resided in Monongalia County. Given these facts, jurisdiction and venue were properly before the Monongalia County Circuit Court.

Further, the language of West Virginia Code § 49-4-606(b) implicitly references a situation where the child's permanency is the only issue—not where new issues of abuse and neglect are raised. Specifically, the statute provides that once a case is transferred to the circuit court of origin, a "permanency hearing" shall be scheduled. Clearly, had the Legislature intended for the circuit court of origin to have jurisdiction and venue over new abuse and neglect petitions arising out of other counties simply because the parental rights of the children's biological parents were terminated by that court, then the statute would have specified that under those conditions a preliminary or adjudicatory hearing should first be held, rather than proceeding directly to a permanency hearing. Accordingly, petitioner's interpretation does not comport generally with a respondent's right to due process pursuant to West Virginia Code § 49-4-601 and more specifically, does not comport with the venue requirements set forth in West Virginia Code § 49-4-601(a). Consequently, the Monongalia County Circuit Court properly assumed jurisdiction in these proceedings.[5]

---

[5]Petitioner raises several assignments of error which are all predicated on specific factual findings of the circuit court. Petitioner argues that the circuit court erred in finding that (1) petitioner's "behavior has clearly shown that [he] cannot and will not" alter his ways; (2) that "there has been no improvement" during the time the children were in petitioner's custody; (3) that petitioner "failed to help [the children] recover from past abuse and neglect;" (4) that "[t]o date, [petitioner does not] seem to recognize how abusive the program was;" and (5) that there was not sufficient time to integrate the children into a stable and permanent home. In a separate assignment of error, petitioner contends that the circuit court erred by not giving due consideration to the possibility that reunification of all children in the same home may not be in the children's best interests.

(continued . . .)

For the foregoing reasons, we find no error in the decision of the circuit court, and its August 6, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: August 31, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn

---

However, in his brief on appeal, petitioner fails to cite to any legal authority in support of these assignments of error. Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure requires that "[t]he brief must contain an argument exhibiting clearly the *points of* fact and *law presented . . . and citing the authorities relied on*, under headings that correspond with the assignments of error." (Emphasis added). Additionally, in an Administrative Order entered December 10, 2012, Re: Filings That Do Not Comply With the Rules of Appellate Procedure, the Court specifically noted that "[b]riefs that lack citation of authority [or] fail to structure an argument applying applicable law" are not in compliance with this Court's rules. Further, "[b]riefs with arguments that do not contain a citation to legal authority to support the argument presented and do not 'contain appropriate and specific citations to the record on appeal . . .' as required by [R]ule 10(c)(7)" are not in compliance with this Court's rules.

Here, petitioner's brief regarding these assignments of error is inadequate, as it fails to comply with West Virginia Rule of Appellate Procedure 10(c)(7) and our December 10, 2012, administrative order. Accordingly, the Court will not address these assignments of error on appeal.

13